## LUSK v. BUSH.

(Circuit Court of Appeals, Ninth Circuit.   October 14, 1912.)

No. 2,108.

1. CONTRACTS (§ 28*)—EVIDENCE OF MAKING.

Evidence *held* to warrant a finding that there was an agreement between the two principal members of a firm that plaintiff should receive a certain percentage of the net profits made by the firm on certain firm contracts for railroad construction in Montana.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 133–140, 1755, 1782–1784;  Dec. Dig. § 28.*]

2. EQUITY (§ 327*)—BILL—VARIANCE.

A fatal variance did not exist between the pleading and proof, where defendant was not misled by the allegations of the bill, and the evidence adduced was the same that would have been presented under an allegation alleging a different relation of the parties from that specified in the bill, which the evidence tended to prove.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 651, 652;  Dec. Dig. § 327.*]

3. EQUITY (§ 335*)—BILL—CLEARNESS.

Equity will regard a bill as stating the facts with sufficient clearness to justify the decree which the court below rendered on the pleadings and evidence.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 673;  Dec. Dig. § 335.*]

4. EQUITY (§ 335*)—OBJECTIONS—WAIVER—VARIANCE.

Plaintiff's failure to plead estoppel was waived by defendant's failure to object on that ground to the introduction of evidence which established it.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 673;  Dec. Dig. § 335.*]

Ross, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of Montana.

Action by Charles M. Bush against Frank S. Lusk.   Judgment for plaintiff, and defendant appeals.   Affirmed.

The substance of the appellee's bill against the appellant is that early in the year 1907 D. D. Streeter and the appellant, Lusk, entered into a copartnership under the name of Streeter & Lusk, with a view to performing contracts in railroad construction in Montana, one portion of which was the construction of a line between St. Regis and the St. Paul Pass tunnel, which work is referred to in the record as the "St. Regis work," and another was the construction of tunnels in association with Winston Bros. Company, a corporation, which tunnels were to be located east of Missoula in Montana; that the agreement between Streeter & Lusk and the Winston Bros. Company provided for an equal distribution between said firm and said corporation of the profits accruing from the work;  and the bill alleges that there has been a final adjustment and settlement between said firm and said corporation, that the copartnership agreement between Streeter and Lusk was oral, that each partner was to advance and contribute equally to the capital necessary to be invested therein, and that out of the moneys received on the contracts such advances were to be first repaid. The bill alleges that the appellee was a railroad contractor and the son-in-law of Streeter;  that he was to render to said firm such aid and assistance in the said work, and in purchasing and

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

forwarding supplies for said work as he might be called upon from time to time to render; that each partner was to receive 45 per cent., and the appellee was to receive 10 per cent. of the net profits of the St. Regis work, and that as to the other work each partner was to receive 47½ per cent., and the appellee was to receive the remaining 5 per cent. of the net profits; that the said copartnership of Streeter & Lusk, at the time when the copartnership was formed, entered into an agreement with the appellee that he should perform such services and receive such compensation as above set forth; that afterwards, in June, 1908, by mutual consent, the compensation of the appellee for his services was enhanced and enlarged by an allowance and credit to him of wages at $200 per month, for the time during which he should render his services while actually in the state of Montana; that in April, 1907, at the instance and request of said copartnership, the appellee took charge of certain railway work near Milwaukee, Wis., known as the "St. Francis cut-off," under contract with the Chicago & Northwestern Railway Company; that the appellee took charge of and looked after and managed and conducted said work at the request of both members of said firm until it was completed in May, 1908, and at the same time he rendered aid and assistance to the firm in respect to its Montana contracts, and that the work which the appellee so did in Wisconsin was, by agreement with said firm, taken and considered as part and parcel of, or in lieu of, the services and assistance which he might or would have rendered in said Montana work, but for the request of said firm, and the appellee was not to be allowed any additional compensation for his said work in Wisconsin; that in the latter part of May, 1908, the appellee was by said firm instructed to go to Montana to perform services in the work of the firm there, and in obedience thereto he went to Montana about June 1, 1908, and performed such services, and in the month of June, 1908, by mutual consent of the copartnership and the appellee, it was agreed that the latter was to be credited and paid by said firm, in addition to said compensation by way of percentages of net profits, a salary at the rate of $200 per month for the time during which he should render his services in Montana, and that he was paid such salary; that he continued on said work in Montana from June 1, 1908, until July, 1909, with the exception of two short trips which he made to Michigan in December, 1908, and April, 1909; that on September 28, 1909, Streeter died intestate, leaving a widow and two daughters; that on November 1, 1909, by an order made and entered in the probate court of Kalamazoo county, in Michigan, where Streeter was domiciled, letters of administration were issued upon his estate, and all the property thereof and the claim of the decedent against Lusk were within the jurisdiction of said probate court; that on July 18, 1910, said court entered its order and decree adjudging that the widow and daughters of the intestate were his only heirs, and were entitled to his estate, and by said order the court assigned and distributed to them the claim which said decedent had at the time of his death against Lusk, and that the said widow and heirs have duly assigned and transferred to the appellee, for his own use and benefit, the said claim, interest, and right of action against Lusk, and all moneys due or owing, and their right to an accounting, settlement, and payment of the moneys, credits, and assets, of the alleged copartnership; that Streeter owed no debts in Montana, and there has been no application in that state for distribution of his estate. The bill alleges that the net profits of the copartnership were more than $410,000, of which the appellee is entitled to 10 per cent., and Streeter was entitled to 45 per cent.; that the net profits of the contract jointly performed by the firm and Winston Bros. Company were more than $58,000; that on April 3, 1909, the copartnership paid to the appellee $25,000 on account of his share of such profits, and that $19,000 is still due and unpaid. The bill prays for an accounting and for a decree in accordance with the appellee's demands.

The answer denies that any contract of any character was entered into between the appellee and the firm, except the contract by which the appellee was to render services upon a salary, and denies that the copartnership paid the appellee the sum of $25,000, and alleges the fact to be that on April 3, 1909, in the absence of the appellant, Streeter, the father-in-law of the appellee, delivered to the appellee the check of the firm of Streeter & Lusk for

the sum of $25.000; that the payment was made, as the appellant was informed and believed, on account of some partnership agreement existing between Streeter and the appellee; that immediately upon learning of this appropriation of $25,000 of the funds of the copartnership, the appellant caused entry to be made on the books of said copartnership, by which Streeter was charged with the receipt of $25,000 of the funds of the copartnership.

By the final decree the court found that the total profits which accrued to the copartnership of Streeter & Lusk from the contracts referred to in the bill were $374,659.84, of which Streeter and Lusk were each entitled to receive $168,596.92, and the appellee, Bush, was entitled to receive $37,465.98, his percentage of 10 per centum upon the net profits of a portion of the work, and five per centum upon the remainder thereof, and the court found the balance due, after crediting certain payments to the respective parties, and directed the sale of certain personal property thereafter to be divided in the same ratio.

Charles S. Wheeler and John F. Bowie, both of San Francisco, Cal., H. H. Parsons, of Missoula, Mont., and Walsh & Nolan, of Helena, Mont., for appellant.

William T. Pigott, of Helena, Mont., for appellee.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above).  [1] The single question presented on the appeal is whether the court below erred in finding that there was an agreement between the firm of Streeter & Lusk whereby the appellee, Bush, was to receive a certain percentage of the net profits on the Montana contracts which were performed by the copartnership. There is no material conflict in the testimony. As to whether or not there was such an agreement, the contentions of the respective parties on the appeal involve only the construction that should be placed upon the testimony and the correspondence and dealings between the parties, and the legal conclusions that should be drawn therefrom. The material facts are in brief as follows:

Streeter and Lusk had for 20 years been friends, and from time to time copartners in various contracts connected with the construction of railroads. On February 1, 1907, Streeter telegraphed to Lusk from Kalamazoo, Mich., saying:

"Will you meet me in Montana early next week? Winstons propose some joint work; prices seem good."

The Winstons referred to were Winston Bros., a corporation engaged also in railroad construction. On March 22, 1907, Streeter wrote to Lusk, stating that the Winstons had proposed doing the Montana work on joint account:

"This matter came to me personally. I asked to have you considered with me. They assented without hesitation. * * * I wish you would wire me their c/o Minneapolis, if you want, or I will wire you, so that you can meet me there on my return about the 13th or 12th."

Early in March Lusk and Streeter went to Montana, examined the ground, and made their figures, and, while their negotiations with the Winston Bros. were pending, Streeter and Lusk held a conference at the Florence Hotel at Missoula. Lusk's version of the conversation is as follows:

"There had been several interviews, and Mr. Streeter came into the room in the hotel that we used for a sort of an office, after coming directly from the Winston Bros.' office. He said: 'Frank, we are going to get that work on shares. If we get that work, I would like to have Charley Bush in on it.' He says: 'Charley is an experienced railroad man, and a good office man, and would make us a valuable man.' And he says: 'He is not a pauper. He can put up his share of the money, and we are going to need every bit of the money before we get through, because that is a big job.' Q. What, if anything, did you say after that? A. Not a word. Q. Was there any talk at any time with regard to the percentage? A. Yes; but I overlooked that. After saying this, he says: 'I would like to have Charley have 10 per cent —like to have him have 5 per cent. of the tunnel work and 10 per cent. of the other.' Q. You say you made no reply to that? A. Absolutely, I did not, upon my head. Q. Why didn't you, Mr. Lusk, reply or say something when he made that remark to you? A. Well, we hadn't got the work. I didn't really believe we were going to get it. We had made what I thought pretty hard conditions; and we were good friends. We had quit our business in Wisconsin on a friendly basis. He tried two or three times—suggested two or three times previously, that it would be a good thing to get Mr. Bush on the work, and I had not agreed with him on Mr. Bush's value, and I thought it was no occasion for arguing or disputing on the subject, when quite likely there would never anything more come of it."

Streeter having died, his version appears through the testimony of one of his attorneys of what was stated by another of his attorneys (Col. Marshall) to Lusk in July or August, 1909, as follows:

"That Mr. Streeter had said to Mr. Lusk substantially: 'We are going to get this work, or this contract, and I want Charley,' meaning Mr. Bush, 'to be in on it.' I don't know that those were the exact words, but that was the substance of it; but, at any rate, he stated to Mr. Lusk what Mr. Streeter had said as to the extent he desired Mr. Bush to have an interest in the matter. Q. What was the extent? A. West of Missoula 10 per cent. and east of Missoula 5 per cent. That when he so stated that Mr. Lusk had said to him, 'Has Charley got the money?'—or Mr. Bush. The substance of Mr. Lusk's response to that statement of the desire of Mr. Streeter, and as stated to Mr. Lusk by Col. Marshall in my presence was, 'Has Charley got the money, or means to carry his part?' and to that Mr. Streeter replied that Charley was no pauper; 'he will carry his part,' or substantially that; of course, I don't undertake to quote the exact words, but that was the substance of it—and that Mr. Lusk did not make any response to that statement by Mr. Streeter. * * * Q. What, if anything, did Mr. Lusk in that talk say to you, or Mr. Marshall, or both of you, with respect to the effect of the conversation related at the Florence Hotel as to whether it constituted a partnership, or entitled Mr. Bush to any share in the profit— did he say anything about that? A. Yes, sir; he did. Q. What did he say? A. Well, he expressed himself, as I might say, and I believe he stated that he did not consider that that created the relation, so far as Mr. Bush was concerned, that Mr. Streeter claimed. He clearly gave us to understand that."

It will be observed that there is no material conflict between these two versions of the conversation. The only difference is that in Lusk's version the remark that the appellee was no pauper and could put up his share of the money was not suggested by a question from Lusk, and in Streeter's version it would appear that it was made in response to a question from Lusk. Both versions agree that Lusk made no answer whatever to Streeter's proposition. Streeter & Lusk soon thereafter got the contracts, but the question of Bush's interest or employment in connection with the contracts was not again discussed between them. There was no written contract of copartnership be-

tween Streeter and Lusk, and there was no entry of Bush's name as a copartner or employé, upon a percentage basis or otherwise, upon the books of the firm. It is very clear that Streeter's proposition to Lusk was that Bush be taken into the copartnership as a member thereof, and that he be paid a certain percentage out of the net profits. The discussion of his ability to carry his part and of his possession of means to do so could have had no other meaning. It seems clear, also, that the suggestion of Streeter, which was not assented to, but was received in silence, did not, under the circumstances, constitute an agreement between Streeter and Lusk for the admission of Bush as a copartner, or for his employment for the firm upon a percentage basis. There was no meeting of the minds of Streeter and Lusk upon that proposition.

The record contains no findings of fact nor opinion of the court below, and in view of the nature of the testimony just considered we must assume that the decree of the court was based upon transactions which occurred subsequently to the time of the conversation at the Florence Hotel, and upon the conduct of the appellant and the circumstances which indicated that he knew that his copartner, Streeter, understood that his proposition to take Bush into the firm had been assented to, and his own silence and his failure to express his dissent to that understanding. It is evident from the testimony that Streeter's understanding of the Florence Hotel conversation was that in what he said he was offering terms of copartnership to Lusk in case the contract should be secured, one of the terms of which was that he and Lusk should be equally interested, and another that Bush was also to be a partner and to receive a designated percentage of the profits. Two days later the contract was secured, and there being no further conversation in regard to Bush's interest, Streeter apparently took it for granted that the terms on which he had proposed to take Lusk in were assented to. We are not convinced that the evidence is insufficient to sustain the conclusion that Lusk was aware that Streeter so understood the terms and scope of the copartnership, and that Streeter believed that Lusk had agreed that Bush should be interested in it, and that, possessing that knowledge, he, by his silence, when he was under a duty to speak, and by his conduct, induced Streeter to believe that he acquiesced in his understanding of the agreement.

Soon after the conversation at the Florence Hotel, Streeter directed Bush, who had been working at Schenectady, N. Y., to go to Kalamazoo, and there he informed Bush, so Bush testified, that he was to be considered as interested in the contemplated Montana work on a percentage basis. On April 6, 1907, Streeter wrote Lusk:

"Charley Bush will be here Monday. I shall keep him here, and leave him behind me, when I go out there, to take care of anything that may develop between here and Minneapolis, so that we can reach him; also he and Pat Connelly will be available, if anything develops in the way of steam shovel works for the Northwestern."

Soon after that Streeter and Lusk entered into a contract for some work in Wisconsin, designated in the record as the "St. Francis cutoff." On April 18th Lusk wrote Streeter:

"Your telegram indicates that the Northwestern gave us the St. Francis work. * * * I think the way that should be handled is for you and Charley and Pat to sub the whole thing from S. & L. 10% less than our price. That makes a clean deal, and does away with any question of personal equipment, that will of necessity have to be taken into consideration. If this is done, you and Charley and Pat can handle that as you please. So far as Charley is concerned, we could get along without him here very easily, and, if he could do well there, it would be better all around."

Both the parties to this suit point to the last sentence of the letter as furnishing support to their respective contentions. On the one hand, it is said that Lusk therein indicated that Bush was not needed in the Montana work, and that it would be better for him to engage in the subcontract suggested, thereby eliminating him from the consideration in the Montana contracts. On the other hand, it is said that the words "we could get along without him here very easily" are to be taken as conceding that Bush was identified with Streeter & Lusk in the Montana work, and that Lusk so understood. Thereafter Bush and Connelly and Streeter organized a concern called the Western Construction Company and took the subcontract. The work was not completed until a year later— about May 18, 1908. During that period Bush received, not only his proportion of the profits of that contract, but a salary of $150 per month from the Western Construction Company. On May 18. 1908, Streeter wrote Bush from Montana, urging him to come there at once to straighten out the accounts of Streeter, Lusk & Winstons. Bush went to Montana, and he was paid $200 per month by Streeter, Lusk & Winstons. During the years 1907 and 1908, Streeter & Lusk had difficulty in obtaining money to finance their contracts. Lusk advanced to the firm about $38,000, and Streeter about $25,000. No money was demanded of or received from Bush. Prior to September 3, 1908, Streeter and Lusk, after the repayment to them of their respective advances, had each drawn out, as dividends, on June 1st $5,000, and on July 23d $10,000; and thereafter in November, 1908, they each drew out $30,000, on December 11th $5,000, on December 23d $45,000, and on February 8, 1909, $45,000. On September 3, 1908, Streeter wrote Lusk from Kalamazoo:

"If you think best, from the size of your accumulation, to make any dividend after paying Streeter & Lusk back all the money they advanced for capital to Streeter & Lusk, and Streeter, Lusk & Winstons, give Charley Bush his share."

To this letter Lusk made no reply, but on the letter which he received he indorsed:

"C. M. B. has no interest in the firms of S. & L. or S. L. & W., unless D. D. S. gives it to him out of his 1/2 in S. & L. or his 1/4 in S. L. & W." .

By the terms of that letter Lusk received the distinct and express information from Streeter that the latter understood that Bush was interested in the profits of the Montana contracts. If Lusk had not in fact assented to that understanding, the observance of the duty of honest and candid dealing that one partner

owes to another required that he immediately notify Streeter that he had not agreed to the proposition that Bush be interested in the contract. On September 18, 1908, Streeter wrote Bush:

"If Mr. Lusk makes a dividend, you may send mine here in New York exchange. I wrote him some time ago that, when Streeter & Lusk were reimbursed for the moneys advanced in both companies, you should be paid your share of the dividends whenever any were disbursed. If there should be a disbursement, and you are not considered, I would like to have you ask him the reason, although I hardly expect there will be any occasion."

Lusk paid no attention to Streeter's letter of September 3, 1908, and he ignored the suggestion of a division of profits. Bush never at any time had any conversation with Lusk about a division of profits. About two months after Streeter's letter, Bush overheard, so he testified, a conversation between Mr. Streeter and Mr. Lusk.

"Mr. Streeter asked Mr. Lusk why I hadn't been included in the dividends. Mr. Lusk replied, because he didn't think it was fair. Mr. Streeter said it was not a question of fairness; that it was an agreement. Mr. Lusk made no reply to that, and about that time I left the office. They were there together after that, but I do not know how long or what, the conversation was after that."

Lusk did not deny that the conversation occurred as stated by Bush, but he testified that the conversation was as follows:

"Mr. Streeter came to my room, and asked me if I had given Charley any check for his share, and I told him I had not. Then he wanted to know if I didn't intend to give him any, and I said I did not, and with that he wanted to know why, and I recited to him the fact that on some Chicago & Northwestern contracts, which were under negotiations by me some years before that, and which had been dropped temporarily, and while they were dropped I went away to Arizona, with some gentlemen about some work, was gone a year, and he had meantime gone ahead, started these negotiations again— the company had—or called us in again, and he took that work and completed that work, took another contract from the Chicago & Northwestern— and I may say that the Chicago & Northwestern was counted my work all the time—I got Mr. Streeter into it, and he acknowledged I was entitled to participate in any work he had. And I learned after getting back from Arizona about this matter, and I said, 'How did they turn out?' He said, 'You are not interested.' And I said, 'Why?' He said, 'You didn't contribute any money, and you don't get any share of the profits,' and we had some little more of that talk at that time, and I said, 'That is not right; that is not fair, and some day you will be sorry for this.' And I said, 'Now. I had this talk with you, Mr. Streeter, and you made that rule on me at that time,' and I said, 'Now is the time that it has come home to you. Charley Bush didn't contribute any money, he didn't contribute any services, and he don't get any share of these profits.' Q. What did Mr. Streeter say with reference to that? A. I don't think he said anything: I don't think either of us said anything—another word about it. I think I said I hoped he had dropped it; I hoped it wouldn't make a rupture; * * * that I hoped it wouldn't make a break in our friendship, but that I could not, in justice to myself, and to be fair to myself and maintain my self-respect, concede the demand, and I hoped he would drop it, * * * and he never spoke to me of it again."

Now, it was not true, as Lusk claims to have stated to Streeter in that conversation, that Bush "didn't contribute any services" for Streeter & Lusk. The evidence is that during the whole of the time during which Bush was engaged in the Wisconsin work he performed occasional services for Streeter & Lusk, and that Lusk

was aware of that fact. The letter of April 6, 1907, which Streeter wrote to Lusk, contained the statement that Streeter would leave Bush behind him when he went to Montana, "to take care of anything that may develop between here and Minneapolis." In the letter of June 4, 1907, Streeter wrote Lusk that he would send Bush to inspect certain cars and rails to be used in the Montana work, and two days later wrote again referring to the same matter. Lusk himself sent letters and telegrams to Bush at Milwaukee, calling for the performance of services for the Montana work of Streeter & Lusk, such as the hiring of laborers, buying machinery, and the securing of free transportation for laborers to go to Montana; and Bush testified to many other acts of service rendered by him, one item of which was his service in looking out for the interests of Streeter & Lusk in their contract with the Chicago & Northwestern, which had been sublet to Streeter, Bush & Connelly. Bush inspected cars, tools, rails, and machinery, and saw to their shipment. He made trips to Chicago and into Michigan for Streeter & Lusk, and that firm furnished him with rubber stamps for use in his correspondence.

The fact that on coming to Montana Bush received a salary of $200 a month for his services while there is not inharmonious with his contention that he was to receive a percentage of the profits on the contract. During the life of the partnership agreement between Lusk and Streeter, each partner was allowed, and was paid in addition to his share of the profits, the sum of $10 a day for every day devoted to the work of the firm in connection with the Montana contracts. The payment to Bush of a salary of a less amount than that which was allowed to the partners was evidently regarded, by Streeter and Bush at least, as in line with the allowances to Streeter and Lusk.

[2-4] The appellee understood that he was an employé upon a percentage of the profits, and his bill in the present suit was framed upon that theory. Streeter understood that the appellant was a partner, and Lusk so understood Streeter's proposition. There is not a fatal variance, however, between the pleading and the proof. The appellant has been in no way misled by the allegations of the bill. The evidence which has been adduced is the same which would have been presented under an allegation that the appellee's relation was that of a copartner, and the relief which has been accorded is the same as that which would have been accorded upon proof that the appellee was a partner. Equity will regard the bill as stating the facts with sufficient clearness to justify the decree which the court below rendered upon the pleadings and the evidence. The appellee's failure to plead estoppel was waived by the appellant's failure to object on that ground to the introduction of the evidence which established it.

The decree is affirmed.

ROSS, Circuit Judge, dissents.