BARRINGER et al. v. LILLEY et al.

In re WINDSOR SQUARE DEVELOPMENT, Inc.

No. 7765.

Circuit Court of Appeals, Ninth Circuit.

May 3, 1938.

As Amended June 13, 1938.

Wm. H. Mackay, of San Francisco, Cal., and John L. Gust, of Phœnix, Ariz. (Ellinwood & Ross and Kibbey, Bennett, Gust, Smith & Rosenfeld, all of Phœnix, Ariz., of counsel), for appellants.

Thomas W. Nealon and Alice M. Birdsall, both of Phœnix, Ariz., for appellee Lilley.

Thomas Armstrong, Jr., R. William Kramer; J. E. Morrison, Walter Roche, and Frank J. Duffy, all of Phœnix, Ariz., for appellee Central Arizona Light & Power Co.

Cunningham & Carson, of Phœnix, Ariz., for appellee Grose.

Before GARRECHT, MATHEWS, and HANEY, Circuit Judges.

GARRECHT, Circuit Judge.

Prior to December 17, 1928, appellant Margaret B. Barringer was the owner of a tract of land located in Maricopa county, in or near Phœnix, Arizona, bounded on the east by Seventh street, on the north by Colter street, on the west by Center avenue, and on the south by Camelback road. On that date a warranty deed to the property was executed by Mrs. Barringer in favor of appellant Phœnix Title & Trust Company, without consideration. This was pursuant to a transaction whereby she sold the property to one Thomas J. Tunney, acting for L. D. Owens, Jr., H. C. Dinmore, and S. W. Mills, for the sum of $105,000; $20,000 was paid by Owens in cash; the balance was represented by a promissory note in her favor in the sum of $85,000, signed by Thomas J. Tunney, an employee of the Title & Trust Company and a dummy in the transaction, Owens not desiring to assume personal liability. The deed was recorded by the Title & Trust Company January 14, 1929.

A declaration of trust was signed by Mrs. Barringer on January 5, 1929, and by Tunney and the Title & Trust Company on January 9, 1929. In this instrument, the Title & Trust Company was referred to as "trustee," Tunney as "beneficiary," and Mrs. Barringer as "payee." It is apparent, however, from a reading of the instrument that Mrs. Barringer, the so-called "payee," was also a beneficiary. The trust instrument declared that the indebtedness secured thereby (the $85,000 note) was a first lien upon and was secured by the entire beneficial interest thereunder. Under the instrument, which provided that the land was to be subdivided and improved, parcels or lots sold were to be released by the trustee to the buyers upon payment to the trustee of the designated release prices of such lots and the amount received was to be applied to the credit of the payee and payment of expenses in specified percentages. The trustee was given power to make all conveyances of the property, to dedicate to public use all streets, roads, parks, easements, etc. Tunney was granted only such possession as was necessary in carrying out his obligations under the trust. He was to bear all costs and expenses incident to the subdivision and improvement of the property and was obligated to furnish the trustee written information as to the number, size, and selling price of the lots into which the tract was

to be subdivided; the representations made to buyers; improvements to be made upon the property; etc. Tunney likewise agreed to pay all taxes, assessments, to keep the property in good condition, to grade the streets, and to complete all subdivision and improvement work, including arranging for electric power and water service. In the event Tunney failed to prosecute with due diligence or to complete the improvements, power was given the trustee or payee or both, to do so, sums expended to become a first lien upon and be secured by the entire beneficial interest under the trust. The trust was to terminate upon sale and conveyance of all the property and payment of expenses of the trustee. The trust agreement was afterwards modified on two occasions.

The trust instrument was never recorded. Neither was it acknowledged.

On January 12, 1929, Thomas J. Tunney assigned his rights under the trust instrument, to L. D. Owens, Jr., an undivided 5/6 interest, to H. C. Dinmore, an undivided 1/8 interest, and to S. W. Mills, an undivided 1/24 interest. The consideration for this assignment was $1.00, and Owens, Dinmore, Mills, and the Title & Trust Company each indorsed thereon an acceptance of the assignment.

The tract was subdivided into 275 lots under the name of Windsor Square. Under the direction of an engineering firm known as Holmquist and Maddock, improvement was begun early in 1929 and continued for nearly a year. The land was leveled and cleared, ditches dug, and a well sunk, water pipe system installed, electric light wiring and street lighting constructed, and paving laid. Money had been deposited by Owens, Dinmore, and Mills, with the Title & Trust Company for the purpose of paying for these improvements, $30,000 on or about December 17, 1928, and $10,000, January 14, 1929. From the improvement fund the Title & Trust Company disbursed the first $53,000 for street improvements. Thirteen thousand dollars of this sum was received from Phœnix Savings Bank & Trust Company which was part of a loan taken out by Owens and his associates for which certain lots were given as security, after being released from the trust upon payment of the release prices to the Title & Trust Company.

Several lots were sold on conditional sales contracts and part of the purchase price paid. Due to the depression of 1929,

sales of lots stopped, but expenses and interest grew while the ability or desire to pay waned. No money was received by the Title & Trust Company after December 20, 1929, and a balance was due upon the note, as of that date, of $69,974.70; $15,125.30 having been paid in. By November 5, 1930, the amount due was alleged by Mrs. Barringer to be $75,777.85.

On June 22, 1929, Owens, Dinmore, and Mills borrowed $19,000 from Phœnix Savings Bank & Trust Company. Of this amount $5,150 was paid by the Title & Trust Company to Mrs. Barringer for the release of 19 lots, which were security to the Bank for the loan. Of the remainder, $13,700 was expended on improvements and the balance for title insurance and trust fees. On November 4, 1930, the day on which they would have become delinquent, the Title & Trust Company paid $1,616.98 in taxes to the treasurer of Maricopa county, Arizona, with funds advanced by Mrs. Barringer. E. J. Bennitt, Mrs. Barringer's brother-in-law, who had acted as her agent in the transaction, was notified that the electric power company had shut off the street lights in Windsor Square and was threatening to do the same with the power for pumping water unless some arrangements to pay the bills were made. Shrader, the caretaker, advised him that neither Owens nor the Title & Trust Company would pay the bills and that if the bills were not paid he would quit. Between July 15, 1930, and December 20, 1930, there was expended by or for Mrs. Barringer, the sum of $1,957.93, for operating expenses of Windsor Square to December 31, 1930.

Long prior to the time here involved and prior to the vesting of the interests of any of the parties before the court, in or to the tract known as Windsor Square, the then owner of a tract of irrigated land, which included the premises now known as Windsor Square, subscribed for shares of stock in the Salt River Valley Water Users' Association and thereby, so it was alleged by the association, irrevocably bound and obligated the land to the said association, and specifically agreed that the land be subject to assessments made by the association and that such assessments should become a lien upon the land. The total assessment for the seasons 1929-30 and 1930-31, up to September 6, 1930, amounted to the sum of $359.34, upon the whole tract as a unit.

Some time prior to June 4, 1930 (the record does not enlighten us just how long), a corporation called Windsor Square Development Company was organized with Gene S. Cunningham as its president, director, and attorney. It transacted no business, incurred no indebtedness, and issued no stock—remained dormant—until June 4, 1930. It was organized solely for the purpose of taking an assignment of the beneficial interest in the trust from, and the assumption of the debts of, Owens, Dinmore, and Mills, and such assignment was made on that date. On October 24, 1930, it reassigned to L. D. Owens, Jr., "all of the assignor's right, powers, privileges and benefits created and reserved by the Declaration of Trust and in and to the real property described as Windsor Square." Each assignment was specifically declared to be subject to the declaration of trust in favor of the Phœnix Savings Bank & Trust Company given to secure the sum of $26,500. On that date, the Windsor Square Development, Inc., had as directors Gene S. Cunningham, Charles A. Carson, Jr., and Margaret Richardson, who resigned on the same day. On the following day, October 25th, new officers and directors were elected, and L. D. Owens, Jr., reassigned the property to the Windsor Square Development, Inc., excepting certain lots which were security to the Phœnix Savings Bank & Trust Company for its loan.

On the same day, October 25, 1930, a voluntary petition in bankruptcy was filed by Windsor Square Development, Inc., signed by Len D. Owens, Jr. The schedules listed as a secured debt the note held by Mrs. Barringer, showing a balance due of $74,170.60; unsecured debts in the amount of $40,013.06 were also set out. In October of 1929, L. D. Owens, Jr., signed five promissory notes, each in favor of a different payee and unsecured. They were listed in the amended schedule at $3,000, $13,500, $19,000, $6,500, and $1,350, respectively. The assets, consisting solely of real estate, were scheduled at $270,000. The total value of the unsold lots in Windsor Square was later estimated by the appraisers at $136,819.50 and the outstanding contracts on conditional sales, $31,789.09. The order of adjudication was entered October 28, 1930.

The facts subsequent to the adjudication are set forth in an opinion of this court, written by Judge Wilbur, and filed July 2, 1937, on motions to strike the statement of evidence from the record and motions to dismiss or affirm. 9 Cir., 91 F.2d 493, 496. The motions to dismiss the appeal were denied, as were the motions to strike the statement of the evidence. The opinion directed that the statement of the evidence be returned to the District Court for settlement after notice to the appellees, so that the court, after hearing, could certify that it was satisfied therewith, if such was the fact. On October 26, 1937, a certified copy of the transcript of record, bearing a certified copy of an order approving the statement of evidence as settled, was filed with the clerk of this court. Thereafter, further briefs were filed on the merits of the controversy, and the cause submitted January 24, 1938.

On April 25, 1931, Mrs. Barringer filed a proof and claim of lien, setting forth the Tunney note for $85,000 and the declaration of trust with the modifications thereof, asserting a lien upon the lots in the tract, and petitioning that the property be sold for the purpose of satisfying the indebtedness, advances, interest, and attorneys' fees and costs. Thereafter, on June 6, 1931, the trustee filed his "Petition to Marshal Liens and Sell Property Free and Clear of Encumbrances," as set forth in our opinion of July 2, 1937, supra.

On September 17, 1932, after hearing, the referee in bankruptcy filed findings of fact and conclusions of law and his order in the matter based thereon. He granted the petition of the trustee in bankruptcy to marshal liens and sell the property free and clear of encumbrances, and decreed the priority of payment. The referee did not include as a lien, either in his findings of fact or in his order, the sum of money remaining unpaid on the Tunney note for $85,000 on the date of filing of the voluntary petition in bankruptcy. On the contrary, he specifically found that sum to be an unsecured indebtedness in favor of Mrs. Barringer and against the bankrupt estate. In addition, the findings of fact recite: "That thereafter and on the 18th day of June, 1931, at a duly called meeting of creditors to consider said petition [to Marshal Liens, etc.], of which meeting due notice was given to all creditors, including Margaret B. Barringer, and no adverse interest appearing at said meeting, an order of sale of said property was made, from which order of sale no review has been taken; that personal service of said order of

sale was made on the attorney for Margaret B. Barringer on June 30, 1931; * * *"

Mrs. Barringer and Title & Trust Company filed exceptions to the Referee's order and decree fixing and marshaling liens, determining priority thereof and adjudging certain asserted liens and interest null and void, and petition to review such order and decree.

On December 13, 1934, the District Court entered its order approving and affirming the referee's order and on the 17th of December entered an order vacating its order of the 13th. On January 7, 1935, the court entered its order approving and affirming the order of the referee fixing and marshaling liens, etc. A petition for allowance of appeal was filed in the District Court on February 5, 1935 and allowed on the same date. A petition for allowance of appeal was filed in this court February 5, 1935, and allowed October 21, 1935, and on September 12, 1936, this court made an order consolidating the record on appeals. The assignments of error are identical in each instance.

▆ The appellants assign nineteen errors, relying upon seven of them. Assignments not urged are deemed waived; we, therefore, do not concern ourselves with such assignments.

The appellants contend that the referee erred:

(1) In finding that Mrs. Barringer sold the tract of land to Owens, Dinmore, and Mills;

(2) In ignoring the Title & Trust Company's record title to the property and the unrecorded declaration of trust;

(3) In finding that appellants held out bankrupt and bankrupt's predecessors as owners of the property, and in permitting witnesses to testify they believed bankrupt's predecessors (Owens, Dinmore, and Mills) owned the property;

(4) In finding bankrupt's predecessors possessed and improved the tract; and

(5) In not holding void and fraudulent the assignment to the bankrupt and its assumption of Owens' debts.

These all present but one actual question: Was Mrs. Barringer entitled to a lien by reason of the balance ·due on the $85,000 note, and, if so, to what priority .was it entitled?

The appellees contend, in support of affirmance:

(1) "An instrument in writing intended to secure the payment of a debt and create a lien upon lands, which is neither acknowledged nor recorded, is void as to creditors, innocent purchasers, and the trustee in bankruptcy of the debtor in possession of the lands upon which the claim of lien is asserted, under the statute of Arizona and the 1910 amendment to the Bankruptcy Act."

(2) "One who withholds from the record a mortgage or other instrument executed for the purpose of securing a debt and at the same time places the debtor in possession of the property knowing that the debtor is holding himself out as the owner, and who upon inquiry by prospective creditors and purchasers fails to disclose that he claims a lien by virtue of such unrecorded instrument, is guilty of fraud upon such creditors and purchasers and is estopped from claiming the existence of any such lien as against creditors of the debtor, innocent purchasers from the debtor and subsequent trustee in bankruptcy of the debtor, who is in possession of the lands."

The first opinion of this court in the instant case says: "The contention of the trustee in bankruptcy is * * * on the proposition that any interest appellants had in the property could not· be set up against the creditors of the bankrupt because of a failure to record the 'Declaration of Trust.' "

▆ Although, in the exercise of commendable discretion, counsel for appellants petitioned for and had an appeal allowed in both the District Court and in this court, upon the theory that it might be held that the appeal was under section 24b of the Bankruptcy Act, 11 U.S.C.A. § 47(b), we find the appeal to be under section 25a of the Bankruptcy Act, 11 U.S.C.A. § 48(a); Coder v. Arts, 213 U.S. 223, 233-235, 238, 29 S.Ct. 436, 53 L.Ed. 772, 16 Ann.Cas. 1008; Matter of Loving, 224 U.S. 183, 187, 32 S.Ct. 446, 56 L.Ed. 725; Federal Housing Administrator v. Moore, 9 Cir., 90 F.2d 32; In re Lane Lumber Co., Ltd., 9 Cir., 217 F. 546, by reason of being taken "From a judgment allowing or rejecting a debt or claim of $500 or over," presenting for review questions of law and fact. Section 24b, Bankruptcy Act, 11 U.S.C.A. § 47(b); 11 U.S.C.A. § 48, p. 443, note 42.

The allowance of an appeal by the District Court was sufficient and the allowance of appeal by this court, while unnecessary, was harmless.

■ The first point urged by the appellants is that: "The trustee in bankruptcy acquired no interest in the property and could not challenge Title & Trust Company's record ownership or Mrs. Barringer's rights under the deed of trust."

When Mrs. Barringer filed her "Proof and Claim of Lien" on April 25, 1931, she acknowledged the jurisdiction of the bankruptcy court and the possession of the trustee. This alone would seem to preclude her from successfully asserting this point. Coder v. Arts, 213 U.S. 223, 29 S.Ct. 436, 53 L.Ed. 772, 16 Ann.Cas. 1008.

■ The trustee in bankruptcy succeeds to the title of the bankrupt in his property as of the date of filing of the petition. Security Warehousing Co. v. Hand, 206 U.S. 415, 423, 27 S.Ct. 720, 51 L.Ed. 1117, 11 Ann.Cas. 789; Isaacs v. Hobbs Tie & T. Co., 282 U.S. 734, 737-739, 51 S.Ct. 270, 271, 272, 75 L.Ed. 645; In re Britannia Mining Co., 7 Cir., 203 F. 450, 453. Mrs. Barringer sold the property to Tunney, who was acting for Owens and his associates, and Tunney assigned his rights under the instrument to Owens, Dinmore, and Mills, which assignment was accepted by the Title & Trust Company, the trustee. The trustee in bankruptcy, in turn, took all the rights in the property which Owens, Dinmore, and Mills had assigned the bankrupt, including possession. It would seem, too, that the trustee in bankruptcy took title to the property for the reason that the declaration of trust should be regarded in the nature of a mortgage rather than a conditional sales contract. The fact that Tunney gave a note for $85,000 and that the declaration of trust recited that it was to secure payment of the note seem to lead irresistibly to the conclusion that the declaration of trust was regarded as a mortgage.

■ The next point is based upon assignments of error which are grouped by the appellants under the head "No Estoppel was Pleaded or Proved." The appellants urge that the lower court erred in approving the referee's findings to the effect that the appellants permitted the bankrupt's predecessors and the bankrupt to hold themselves out as owners of and to exercise dominion over the property and that in reliance thereon credit was extended to them. The appellants further contend that there was error in permitting certain creditors to testify that they believed the property in question to be owned by Owens, Dinmore, and Mills. The assignment of error upon which this last contention is based does not conform to our rule 11, in that the full substance of the testimony objected to is not set out therein. Dayton Rubber Mfg. Co. v. Sabra et al., 9 Cir., 63 F.2d 865, 866; Fidelity & Deposit Co. of Maryland v. United States ex rel. Woods, 9 Cir., 72 F.2d 828; United States v. National Bank of Commerce, 9 Cir., 73 F.2d 721, 724; Shores v. United States, 9 Cir., 80 F.2d 942, 947; Northern Pac. Ry. Co. v. Wagner, 9 Cir., 86 F.2d 63, 65.

■ The appellee trustee in bankruptcy contends that the appellants are estopped to assert a lien against appellees and that such estoppel need not be pleaded. Assuming that such estoppel by conduct need not be pleaded as, indeed, the appellee Lilley's cases seem to indicate (Lusk v. Bush, 9 Cir., 199 F. 369, 376; Missouri Pac. R. Co. v. Bartlett, 8 Cir., 79 F.2d 275, 279), we are of opinion that the appellants' conduct did not operate as an estoppel simply because no creditor had any right to believe that anyone, other than the appellant Title & Trust Company owned the property. The record title stood in the name of the Title & Trust Company and was, under section 972 of the Revised Code of Arizona 1928, notice to all persons of the existence of the deed whereby it acquired title.

■ Section 969 of the same Code declares that all mortgages and deeds of trust "shall be void as to all creditors and subsequent purchasers for valuable consideration without notice, unless they are acknowledged and filed with the recorder to be recorded, as required by law." This statute protects creditors and innocent purchasers against an unscrupulous or dishonest *owner of record in possession*. Were it otherwise, a search of the record might disclose a clear title while the property was actually mortgaged to the limit. It is easy to see the reason for the rule in such a case, but in the instant case we are confronted with a different situation in that the record title was not in the one in possession, but in another. To hold, as appellee Lilley urges, that the record title in the Title & Trust Company was meaningless, would be to place land owners everywhere at the mercy of their tenants. Mere naked possession is not enough. When the creditors were

giving credit to Owens, Dinmore, and Mills, if they assumed Owens and his associates to be the owners of the property, the assumption was unwarranted. If inquiry was made by the creditors they would have actual notice of the declaration of trust, else how could Owens explain away the record title in the Title & Trust Company?

It being established that record title was in the Title & Trust Company, it follows that all creditors were creditors with notice of the fact that Owens and his associates were *not* owners of the tract, at least so far as the record was concerned—which is notice to all the world.

■ As between the parties thereto and their successors in interest with actual notice the unacknowledged and unrecorded declaration of trust was as good as though all formalities had been complied with. This much must be conceded. Section 969, Rev.Code of Arizona 1928. As to other persons, without notice thereof, it was as much a nullity as if it had never existed. Whatever right to possession Owens, Dinmore, and Mills may have had was acquired through this declaration of trust. From this it follows that Owens and his associates and their successor, the bankrupt corporation (which, incidentally, did not incur the debts), are in no position to deny the existence or effect of the document through which they acquired possession of Windsor Square. "The estoppel here relied upon is known as an equitable estoppel, or estoppel in pais. The law upon the subject is well settled. The vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both. This remedy is always so applied as to promote the ends of justice. It is available only for protection, and cannot be used as a weapon of assault. It accomplishes that which ought to be done between man and man, and is not permitted to go beyond this limit. It is akin to the principle involved in the limitation of actions, and does its work of justice and repose where the statute cannot be invoked." Dickerson v. Colgrove, 100 U.S. 578, 580, 25 L.Ed. 618.

When Mrs. Barringer gave the deed to the property to the Title & Trust Company and took the Tunney note for $85,000, precisely the same situation was created as if Owens and his associates had owned the property, borrowed the money and given a deed to the property and a promissory note and declaration of trust to secure repayment. In either case the record title in the Title & Trust Company would be sufficient to put all persons on notice that Owens, Dinmore, and Mills did not own the property or that it was encumbered. Such a deed would then be a conveyance in the nature of a mortgage, with the title in one person subject to being defeated by the performance of a condition.

■ The remaining point raised by the appellants is that: "The whole bankruptcy proceedings were fraudulent and void." The question of fraud upon creditors does not appear to have been raised by appellants, or any creditor for that matter, in the proceedings before the referee. Mrs. Barringer did allege in a petition to the referee to review his order marshaling liens, etc., "that the assumption of said indebtedness was wholly fictitious and for the sole purpose of delaying and obstructing said Margaret B. Barringer from foreclosing her lien, as in said Declaration of Trust provided." The appellants do not indicate in their briefs that the question of fraud was directly drawn to the attention of the referee or of the court below, nor do they point out in the assignment of error any ruling upon such question. We are reluctant to rule on any question which has not been called to the attention of the court below, save that of jurisdiction.

The conduct of Owens, Dinmore, and Mills from the very beginning of their relations with this property, particularly the unusual method of their exit from the scene of activity; the numerous and devious conveyances of their interests in this debt encumbered property, so swift at times that it is difficult to keep pace with them, culminating finally in a transfer to a corporation used solely for the purpose of being packed with unpaid debts incurred in the operations of this speculative enterprise; followed by immediate precipitance into the bankruptcy court where personal liability might be evaded—were all circumstances to arouse suspicion. But it does not appear that this point was ever pressed.

■ The possession of the trustee in bankruptcy cannot be justified without recognizing a lien in Mrs. Barringer because the only right passing to appellee Lilley

from the bankrupt was through Tunney and the declaration of trust. If we recognize the declaration of trust at all, we must recognize the rights of appellants thereunder. We have already shown that the creditors are not creditors without notice and even though the declaration of trust may be void as to them, there is no explaining away the record title in the name of appellant Title & Trust Company.

We, therefore, set aside the order appealed from and direct the entry of a decree ordering the sale of the property in the possession of the trustee in bankruptcy and described in the declaration of trust, to satisfy the lien of Mrs. Barringer for the amount of the Tunney note with interest and attorney's fees, as provided in said note, and, as well, the advances made by her just prior to bankruptcy, with interest thereon; subject, however, to the claims of the State of Arizona and its political subdivisions for taxes and the claim of the Salt River Valley Water Users' Association for assessments and charges. It was stipulated before the referee that the lien for taxes due the State of Arizona and the county of Maricopa might be fixed in the amount of $1,410.46. It was also stipulated at the same time that the facts shown in the sworn answer of Salt River Valley Water Users' Association are correct. At the argument of the motions to dismiss, etc., it was agreed between counsel that that part of the order and decree of the referee in bankruptcy fixing and determining the liens and property interests of the Central Arizona Light & Power Company might be affirmed, and it is so ordered. The other creditors to share pro rata in the remaining proceeds of the sale of the above property and whatever other assets the trustee may have.

Order of the District Court affirmed in part and reversed in part.